# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **MICHAEL D. HANCOCK,** | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | **Case No. 6:18-cv-03170-MDH** |
| | ) | |
| **JIM ARNOTT, et al.,** | ) | **Consolidated with Cases:** |
| **Defendants** | ) | |
| | ) | |
| **ANTHONY T. PORTER,** | ) | **Case No. 6:18-cv-04114-MDH** |
| **Plaintiff** | ) | |
| **v.** | ) | |
| | ) | |
| **MASSIE, et al.,** | ) | |
| **Defendants** | ) | |
| | ) | **Case No.:  6:18-cv-03212-MDH** |
| **COURTNEY BLADE,** | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | |
| | ) | |
| **ADVANCED CORRECTIONAL** | ) | |
| **HEALTHCARE,** | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Before the Court are multiple motions for summary judgment:  Defendants Arnott, Coonrod, Denny, Greene County Sheriff's Office, Howell and Johnson's Motion for Summary Judgment as to Plaintiff Hancock (Doc. 236); Defendants Arnott and Greene County's Motion for Summary Judgment as to Plaintiff Blade (Doc. 239); Defendants Dr. Wilkins and Advanced Correctional Healthcare, Inc.'s ("ACH") Motion for Summary Judgment as to Plaintiff Blade (Doc. 242); Defendants Dr. Wilkins, Partenheimer, and ACH's Motion for Summary Judgment as to Plaintiff Hancock (Doc. 245); Defendants Arnott and Greene County, Missouri's Motion for Summary Judgment as to Plaintiff Porter (Doc. 274); and Defendants Dr. Wilkins, Massie and ACH's Motion for Summary Judgment as to Plaintiff Porter (Doc. 278).

1

Plaintiffs' lawsuits allege Greene County's policy implemented and enforced by Defendants, makes pre-payment a pre-requisite for necessary medical treatment for inmates in violation of their constitutional rights. The Court initially heard evidence on Plaintiffs' motion for preliminary injunctive relief and ruled that to the extent Greene County Jail's ("Greene County") policy requires inmates to pre-pay for necessary medical treatment of serious medical needs it would violate the constitution. This Court further held that whether an inmate has a serious medical need is a case-by-case determination and that based on the evidence before the Court, at that time, Plaintiff Hancock's hernia constituted a serious medical need, but that Hancock's other complaints did not constitute serious medical needs. Plaintiff Blade's eye complaints were found not to constitute a serious medical need.[1] The Court granted in part Plaintiffs' motion for injunctive relief. (See Doc 100). The Court ordered that to the extent Hancock remained in custody he should be further examined by Dr. Woods. Defendants were further ordered to treat Hancock for his hernia without requiring pre-payment. The Court's prior Order was dated April 2, 2019. Hancock had been transferred to Missouri Department of Corrections on March 20, 2019.

Now before the Court are Defendants' motions for summary judgment on Plaintiffs' claims. Plaintiffs' Amended Complaints each raise one count – Count I – Violation of 42 U.S.C. § 1983: Cruel and Unusual Punishment. Defendants Dr. Wilkins and the ACH Defendants (including Dr. Wilkins, Nurse Partenheimer, and Nurse Massie) generally argue that Plaintiffs have failed to state a claim of a constitutional violation; that Defendants did not have any policy, procedure, or custom that violated a constitutional right; and that Defendants cannot be held vicariously liable for the alleged violations of Plaintiffs' constitutional rights. The Greene County Defendants (including Sheriff Arnott, Denney, Johnson, Coonrod, and Howell) generally argue

_____

[1] Plaintiff Porter's claims were not raised in the previous motion or the Court's prior Order.

that Plaintiffs have failed to state a claim of a constitutional violation; that Plaintiffs do not have serious medical needs; that Plaintiffs cannot show that Defendants were the moving force behind an Eighth Amendment violation in order to establish municipal liability; that Plaintiffs failed to exhaust administrative remedies; and that Plaintiffs lack standing for relief as their claims are moot. The motions for summary judgment are specifically addressed as to each of the Plaintiffs' claims below.

**BACKGROUND[2]**

**Greene County and ACH Defendants**

Greene County's policy states, in part:

> While incarcerated in the Greene County Jail, your medical care will be under the direction of the Jail's Physician. If you require care outside of the facility, you must assume responsibility for payment of that care.

Greene County Jail Rulebook, page twenty-six, Section 6.

Missouri Revised Statute § 221.120 states:

> If any prisoner confined in the county jail is sick and in the judgment of the jailer, requires the attention of a physician, dental care, or medicine, the jailer shall procure the necessary medicine, dental care or medical attention necessary or proper to maintain the health of the prisoner. The costs of such medicine, dental care, or medical attention shall be paid by the prisoner through any health insurance policy as defined in subsection 3 of this section, from which the prisoner is eligible to receive benefits. If the prisoner is not eligible for such health insurance benefits then the prisoner shall be liable for the payment of such medical attention, dental care, or medicine, and the assets of such prisoner may be subject to levy and execution under court order to satisfy such expenses in accordance with the provisions of section 221.070, and any other applicable law. The county commission of the county may at times authorize payment of certain medical costs that the county commission determines to be necessary and reasonable. As used in this section, the term "medical costs" includes the actual costs of medicine, dental

---

[2] The facts presented in the pending summary judgment motions have been considered by the Court in a light most favorable to Plaintiffs. Further, the Court has reviewed nearly 800 paragraphs of "material facts" submitted by the parties in the pending briefs. For purposes of this Order the Court has recited the facts it finds relevant to its rulings on the pending motions.

3

care or other medical attention and necessary costs associated with such medical care such as transportation, guards and inpatient care.

Informational booklets provided to inmates, "Inmate Rulebooks," further state, in part:

Inmates will not be denied medical treatment for inability to pay, but the inmate's trust account will still be charged. When an inmate receives money the fee will be deducted before any other transactions occur. No inmate will be denied health care services due to an inability to pay. All services will be ordered at the discretion of the Jail's medical staff and/or physician.

The Inmate Rulebook further states Greene County shall require reimbursement for medical services provided to inmates per RSMo Section 221.120 and that while incarcerated in the Greene County Jail an inmate's medical care will be under the direction of the Jail's Physician and that "if you require care outside of the facility, you must assume responsibility for payment of that care."

ACH provided inmate medical services at Greene County through Jason Wilkins, M.D., a licensed physician, and other medical professionals. Dr. Wilkins provided medical services on behalf of ACH, a private entity, to inmates within Greene County Justice Center. He worked for the Greene County Sheriff from 2008 until 2017 and then began working for ACH. Eric Partenheimer is a registered nurse and provided care to inmates in the Greene County Justice Center. ACH also assisted in drafting and implementing specific medical policies and maintaining the appropriate standards and accreditation for such policies.

This Court has already held that if Greene County's written policy was implemented so as to require inmates to provide prepayment as a condition to receiving necessary medical treatment for a serious medical need it would violate the constitution. Nothing in this Order should be construed to alter that ruling. (See Doc. 100). To be clear, necessary medical treatment of a serious medical need may not be withheld based on an inmate's ability (or inability) to prepay for such medical treatment. However, placing the ultimate financial responsibility for medical treatment and services on the inmate is not a constitutional violation.

4

**Plaintiff Hancock**

Plaintiff Hancock arrived at Greene County on May 14, 2017 shortly after undergoing surgery for gunshot wounds. Dr. Robert Johnson performed the surgery on May 11, 2017 at Mercy Hospital in Springfield, Mo. Hancock was detained from May 2017 through March 2019 and was examined and treated by ACH medical staff and outside Mercy health providers during that time. In May, Hancock was seen for follow up appointments for his surgery. On May 22, 2017 Hancock was sent to Mercy Hospital emergency room for evaluation. Hancock underwent an abdominal CT scan. Hancock did not have a hernia at that time. Hancock was discharged on May 24, 2017 and returned to Greene County. Hancock was again seen at Mercy on May 31, 2017 for a follow-up appointment. Hancock was not required to provide prepayment for any of the outside care he received for those visits.

On June 4, 2017, Hancock complained about his medical care and filed a grievance. On June 11, 2017, Hancock was seen by a nurse at Greene County for a complaint of chest pain and shortness of breath. Dr. Wilkins then examined Hancock on June 15, 2017. Hancock complained of right-sided abdominal pain. Dr. Wilkins notes state "c/o right sided abdominal pain. No distress noted. Will repeat labs."

On July 3, 2017, Hancock was seen by a nurse and after being examined put on the list to be seen again by Dr. Wilkins. Hancock was seen by Dr. Wilkins on July 7, 2017. Hancock was experiencing abdominal pain and sciatica pain to his left lower foot. Dr. Wilkins ordered that Dr. Johnson, who performed the prior surgery, be contacted to determine if a follow up was needed. Dr. Johnson's office stated there was no indication for a follow up. Dr. Wilkins then saw Hancock again on July 10, 2017. Hancock was angry and left the examination room before he could be fully examined. Hancock demanded medication for the "bullet that was moving" inside him. Dr.

Wilkins ordered Hancock to follow up with his surgeon Dr. Johnson. Hancock was sent to Mercy Clinic Fremont on July 19, 2017 where he saw a physician assistant. Hancock reported lower abdominal pain and left leg pain he believed from the bullet. The physician assistant ordered a CT scan to assess Hancock's abdomen, pelvis and back pain and to follow up after the CT scan. Hancock had a CT scan on August 2, 2017. The CT scan showed no hernia but a large amount of retained stool. On August 7, 2017, Hancock was again seen at Mercy Clinic. Hancock complained of intermittent abdominal pain and left leg numbness which he thought was cause by a bullet. The surgeon's office did not diagnose a hernia on August 7 and ordered magnesium citrate for Hancock's constipation. Hancock was not required to provide prepayment for any of the outside care he received in these visits.

On September 13, 2017, Hancock was seen by Dr. Wilkins for a sore throat with no reference to a hernia or back pain on this visit. On November 16, 2017, Hancock saw Dr. Wilkins for a complaint of heartburn. Hancock's prescription for Prilosec was renewed. Hancock did not reference back pain or a hernia on this visit. On November 26, 2017, Hancock's blood pressure was 146/86 and Dr. Wilkins ordered Lisinopril for Hancock. There was no reference to hernia or back pain.

On November 28, 2017, Hancock saw a nurse for complaints of stomach pain and that he thought he had a possible hernia. On November 30, 2017, Dr. Wilkins examined Hancock and assessed an incisional hernia from his previous surgery and determined it was reducible and could be easily moved into place. Dr. Wilkins informed Hancock that he would contact Mercy for their opinion but that operative treatment would be considered elective and could safely be delayed until he was released. On December 12, 2017, Hancock saw Dr. Luehr, a trauma surgeon with Dr. Johnson's office. Dr. Luehr noted that Hancock had a small easily reducible ventral hernia and

6

could be scheduled for elective repair. Hancock gave consent for Dr. Luehr to perform elective laparoscopic ventral hernia repair. The medical notes indicate that Dr. Luehr would plan for laparoscopic ventral hernia repair and Hancock was instructed to present immediately if hernia became non-reducible or symptoms worsened. Hancock was not admitted and no time frame was established for the surgery. Hancock was cleared to return to Greene County.

On December 14, 2017, Dr. Wilkins attempted to see Hancock for follow up with him regarding his hernia but Hancock refused to be seen. Hancock alleges his hernia had grown in size during this time, that he experienced increased pain, and that his condition was worsening while incarcerated at Greene County. Hancock states he requested surgery on multiple occasions and was denied the surgery because he could not pre-pay for the procedure. However, the record does not contain any evidence to support Hancock's vague allegations that his condition was worsening and there is no evidence that Hancock's hernia became non-reducible during this time.[3]

On December 18, 2017, Hancock complained that he needed to see a specialist for his back. Hancock left that visit with Dr. Wilkins prior to being fully evaluated. On January 8, 2018 Hancock saw Dr. Wilkins for a complaint related to his hernia. Dr. Wilkins indicated he would contact the surgeon's office but explained the surgeon had indicated the surgery was not immediately necessary. ACH staff contacted Dr. Johnson's office and were told that nothing could be scheduled until it was determined whether payment would be required. It was further stated that if the hernia protruded or became strangulated to take Hancock to the emergency department.

---

[3] Hancock has not provided any medical records that establish that his symptoms had worsened or that his hernia had become non-reducible during this time frame. Further, as stated herein, Hancock denied medical concerns in March 2019 when transferred and screened at the Missouri Department of Corrections and did not undergo surgery for the hernia until June 2020.

7

Dr. Wilkins ordered continued observation of Hancock and told Hancock to report if there were any complications. Hancock also visited ACH medical staff for unrelated issues and with inconsistent reports of hernia and back pain.[4] Hancock was examined on March 4, 2019 for back pain. He was given Tylenol and instructed to rest and apply heat to the area. Hancock stated the back pain had been going on for 7 days at that time. Hancock filed his initial complaint in this matter on May 29, 2018.

On March 20, 2019 Hancock was transferred and screened at the Missouri Department of Corrections. Hancock denied pain or needing medical attention related to a hernia or back pain at that time. Hancock was medically cleared to work in food service. Hancock states he underwent hernia surgery in June 2020.

**Plaintiff Blade**

Plaintiff Blade was a pre-trial detainee in the Greene County Jail and received treatment from Dr. Wilkins and ACH while incarcerated there. Blade was seen and provided treatment for complaints relating to his eye.[5] On March 22, 2018, Blade saw Dr. Wilkins for a complaint relating to a swollen left eye. Blade reported he suffered an injury to his left eye. Dr. Wilkins assessed Blade as having conjunctivitis and a possible abrasion. He was prescribed Tobramycin and Dexamethasone. On March 29, 2018, Blade saw Nurse Brandy Watkins for a complaint related to poor vision and "floaters." Nurse Watkins contacted Dr. Wilkins who assessed Blade with a

---

[4] Hancock was involved in fights with an inmate on March 16, 2018 and December 27, 2018 and denied medical concerns at those times. Plaintiff was also involved in a struggle with detention officers on July 11, 2018 and did not report medical concerns. Plaintiff saw ACH staff regularly through March regarding ear pain.

[5] The record before the Court contains other medical records for Blade that the Court finds irrelevant to the pending motion.

subconjunctival hemorrhage and ordered Blade to be sent out of the jail to Optiland for an eye evaluation.

On April 2, 2018, Blade saw Dr. Wilkins for a chronic care appointment and did not have any complaints related to his eyes. On April 12, 2018, Blade underwent an examination at Heffington's Optiland by Dr. Dennis White. Blade informed Dr. White that he had floaters. Blade did not have to prepay for the appointment with Dr. White. Dr. White stated Blade had no signs of retinal holes, tears, detachments, or lesions. Dr. White diagnosed Blade with having a regular astigmatism in both eyes. He did not recommend immediate referral to an ophthalmologist and did not diagnose Blade with vision loss due to an eye injury. Dr. White stated in the medical records "if continues to see flashes of light over next couple weeks recommend seeing an Ophthalmologist (sic) for retinal evaluation."

On April 13, 2018, Blade submitted a health service request stating, "my gums have an infection and bleeding and teeth are loose." On April 14, 2018, Blade saw Nurse Kristy Battles regarding his complaint related to a gum infection. On April 21, 2018, Blade submitted a health service request stating, "this is a follow up on my eye to the specialist that the eye doctor referred inc (sic) to still seeing floaters and black spots." On April 28, 2018, Dr. Wilkins approved a referral to an ophthalmologist and placed the referral for Blade to be sent to Missouri Eye Institute on May 31, 2018. On May 2, 2018, Optiland entered a message in Blade's account record that stated, "jail called and wants referral to opthal – DH told them probably MEI and would need to be prepaid before anyone would see him – she will talk to the Dr there and determine who will pay." That same day Blade saw Nurse Warnhoff for a complaint regarding his gums and teeth. Blade did not complain about his vision or eyes at this visit.

9

On May 25, 2018, Officer Wilkinson notified Blade that Missouri Eye Institute required payment before they provide treatment. He was told Greene County was not refusing to treat him and that according to RSMo Section 221.120 the prisoner shall be liable for the payment of such medical attention. On May 31, 2018, Blade requested to be seen by an eye specialist. On June 10, 2018 Optiland entered a message in Blade's account record that stated, "Ruth at MEI called – jail had called them to set up an appt, however he is unable to pay for the exam so they will not schedule him. We will not see him again either until he comes with $138 he owes from the 04/12/18 exam, plus prepayment for anything else." Optiland charged Blade $179.00, adjusted the amount of $41.00 to a total of $138.00, for his eye exam on April 12, 2018. Greene County ultimately paid the bill. On June 19, 2018, Blade stated in writing he was denied a specialist.[6]

On September 20, 2018, Blade had a chronic care appointment with Dr. Wilkins and refused his last three lab orders stating it was due to financial reasons. Dr. Wilkins reminded Blade that there was no charge for labs and that they were important. During this visit Blade did not reference any eye complaints. Blade had numerous additional interactions, including requests for health services, with the nurses and Dr. Wilkins regarding his feet and nerve pain in 2018 through March 23, 2019.[7] Blade left Greene County for prison in April 2019.

Blade was incarcerated at Fulton Reception and Diagnostic Center from April 24, 2019 through July 30, 2019. Blade was seen on May 8, 2019 by Dr. Alfred Garcia for a complaint

---

[6] The parties dispute whether Blade had sufficient funds to pay $250 for the ophthalmologist. Defendants state Blade spent over $250 for commissary items. Blade argues the records do not support this fact. For purposes of this Order, the Court assumes facts most favorable to Plaintiff.

[7] Blade made health services requests on December 6 and 12, 2018 none of which raised concerns about his eyes or vision. Blade was seen by the nurses or Dr. Wilkins on October 20, 2018, December 8, 17, 24, 2018, January 7 and 14, 2019, and March 10, 12, 14 and 23, 2019. During those visits Blade did not raise concerns about his vision or his eyes. Blade was seen for complaints regarding nerve issues, rashes and other concerns.

related to an eye issue that he reported was the result of being poke in the eye two years before. Blade stated that he saw floaters and black spots. Dr. Garcia's records indicate that the examination was grossly unremarkable but that he would be referred to an eye doctor. On May 16, 2019, Blade saw Dr. Michael Lane, an optometrist who diagnosed Blade with posterior vitreous detachment but did not recommend any treatment for that condition. Blade's vision at the appointment was better than his vision when he saw Dr. White at Optiland in 2018. Dr. Lane did not refer Blade to an ophthalmologist. As of July 30, 2020, Blade was incarcerated at South Central Correctional Center where he arrived in July 2019. In September 2019, Blade was seen by an optometrist who said he had no change in his vision.

**Plaintiff Porter**

Plaintiff Anthony Porter arrived as an inmate at Greene County around January 2017. Porter was incarcerated at other facilities prior to Greene County.[8] Porter received medical treatment from Nurse Solita Massie and Dr. Wilkins. Porter was seen for a variety of conditions including complaints related to his mouth. During his first four months of detention at Greene County Porter either received or refused medical attention at least 17 times.

Initially, Porter did not have any dental complaints on January 13, 20, or 23, 2017 when he was seen by ACH medical staff at the jail. On February 28, 2017, Porter was transferred to Cox Health North emergency room for a complaint of a cystic structure on the roof of his mouth for 3-5 years that had developed after he had orbital fracture surgery in 2011. Porter states he never saw

---

[8] Porter was incarcerated in the Cook County, Illinois jail on August 16, 2016 and complained of an inability to open his mouth due to a toothache. He complained to Cook County on September 7, 2016 that his face was swollen and he couldn't open his mouth and on September 12, 2016 that he had an orbital fracture and he was scheduled for a dentist appointment. Plaintiff was incarcerated at Rutherford County, Tennessee on December 22, 2016. Plaintiff did not make any dental complaints upon his arrival.

11

an oral surgeon, dentist, or ENT after his surgery in 2011. However, Porter previously complained of mouth pain while incarcerated at other jails in 2016.

Dr. Schmitt at Cox examined Porter and then cleared him to return to Greene County. Dr. Schmitt did not refer Porter to an oral surgeon for surgery but recommended an ENT consult and Augmentin. Dr. Wilkins prescribed the Augmentin and scheduled an appointment with Dr. Fenwick, an otolaryngologist at Ferrell Duncan Clinic ENT, for March 20, 2017. Dr. Wilkins followed up with Porter on March 2, 2017 after his emergency room visit and noted Porter was not compliant with taking his antibiotic. On March 20, 2017, Porter was examined by Dr. Fenwick. Dr. Fenwick recommended a CT scan of Porter's facial bones which occurred on March 27, 2017. After the CT scan, Dr. Fenwick stated Porter needed to see an oral surgeon and made a referral to OMS. Porter was not required to prepay for any of the outside medical care he received on these visits. An appointment was scheduled with Dr. Arquitt at OMS for May 4, 2017. Porter was released from Greene County on April 20, 2017, before his scheduled appointment.[9]

During his release from custody Porter did not seek any medical treatment for the cyst in his mouth. Porter was reincarcerated at Greene County on December 28, 2017. At intake Porter signed an intake form stating that he did not have any painful dental conditions. Porter saw ACH staff for issues related to his left thumb, for which he was sent to the hospital for x-rays, in January 2018. In February 2018, Porter saw Dr. Wilkins regarding his mouth. Dr. Wilkins requested records from Cox Health and ordered Porter to follow-up with the ENT. Porter was scheduled for March 23, 2018 to see Dr. Fenwick. Porter refused to sign the health service request to be examined by nurse Massie at Greene County and refused to see the dentist on February 28, 2018.

---

[9] After two weeks of being released, Porter went to Cook County, Iroquois County, and then Cape County jails.

Porter refused to be seen by Dr. Wilkins on March 1, 2018. Porter requested to see the dentist on March 12, 2018 but again refused to be seen.

On March 23, 2018, Porter again saw Dr. Fenwick, ENT. Dr. Fenwick noted that Porter had not followed up with a return visit after his CT. He further recommended a barium swallow and a consult with an oral surgeon. A barium swallow was scheduled for March 29, 2018 and the results were that Porter had an unremarkable esophagram.

On April 7, 2018 Porter again refused to be seen by a dentist and refused to be seen by a nurse on April 17, 2018. Porter saw Dr. Wilkins on April 19, 2018 but did not have any complaints or issues related to the cyst in his mouth. Porter was then seen by an oral surgeon, Dr. Gibson, at OMS on April 30, 2018. Dr. Gibson recommended removal of the cyst in Porter's mouth and informed Porter of the risks and benefits of the procedure. Dr. Gibson did not schedule the surgery at that time but his notes state "will schedule." Dr. Wilkins was informed to start prescription amoxycillin and to call to schedule appointment for Porter. Porter was not required to prepay for any of the outside care he received on these visits.

After the visit on April 30, 2018, Porter filed no further requests to be seen by medical at GCJC. Porter was not seen by any medical professionals at the GCJC after April 30, 2018. He made no further medical requests.

On May 7, 2018, Nurse Kalyn Sampson contacted OMS to schedule Porter's procedure for oral surgery as requested by Dr. Gibson. However, Dr. Gibson's nurse called Nurse Sampson and told Nurse Sampson that Dr. Gibson would not perform this surgery while Porter was incarcerated. Porter argues he was denied surgery because Defendants would not prepay the costs.

Porter was released from Greene County in approximately July 2018 and went to Iroquois County, Illinois jail. Porter testified in his deposition in January 2020 that he had not obtained any

further treatment for the cyst and has not had surgery to remove the cyst. Porter testified after he was released from jail in August or September 2019 he did go to see Dr. Gibson without an appointment and was told he needed to get insurance to have the surgery performed.

## STANDARD

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A question of material fact is not required to be resolved conclusively in favor of the party asserting its existence. Rather, all that is required is sufficient evidence supporting the factual dispute that would require a jury to resolve the differing versions of truth at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-249. Further, determinations of credibility and the weight to give evidence are the functions of the jury, not the judge. *Wierman v. Casey's General Stores, et al.,* 638 F.3d 984, 993 (8th Cir. 2011).

**DISCUSSION**

Plaintiffs argue that Greene County Justice Center's policy requiring inmates to pre-pay for treatment of a serious medical need amounts to unconstitutional deliberate indifference.

The Greene County Jail's policy states:

> While incarcerated in the Greene County Jail, your medical care will be under the direction of the Jail's Physician. If you require care outside of the facility, you must assume responsibility for payment of that care.

Missouri Revised Statute § 221.120 states:

> If any prisoner confined in the county jail is sick and in the judgment of the jailer, requires the attention of a physician, dental care, or medicine, the jailer shall procure the necessary medicine, dental care or medical attention necessary or proper to maintain the health of the prisoner. The costs of such medicine, dental care, or medical attention shall be paid by the prisoner through any health insurance policy as defined in subsection 3 of this section, from which the prisoner is eligible to receive benefits. If the prisoner is not eligible for such health insurance benefits then the prisoner shall be liable for the payment of such medical attention, dental care, or medicine, and the assets of such prisoner may be subject to levy and execution under court order to satisfy such expenses in accordance with the provisions of section 221.070, and any other applicable law. The county commission of the county may at times authorize payment of certain medical costs that the county commission determines to be necessary and reasonable. As used in this section, the term "medical costs" includes the actual costs of medicine, dental care or other medical attention and necessary costs associated with such medical care such as transportation, guards and inpatient care.

The Eighth Circuit has defined "a serious medical need" as "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995) (internal citation omitted); and *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011); see also Model Civ. Jury Instr. 8th Cir. 4.22 (2018) (Definition: Serious Medical Need – Convicted Prisoners (42 U.S.C. § 1983)). Further, "medical conditions need not be emergencies in order to be considered serious." *Roe v. Crawford*, 514 F.3d 789, 801, n. 9 (8th Cir. 2008).

15

Further, in interpreting "a serious medical need" this Court found an inmate displaying significant symptoms interfering with the activities of daily life, suffering significant daily pain, or suffering from a deteriorating medical condition, may have a serious medical need that requires treatment even if the condition is neither "emergent nor urgent" as those terms may be used in the medical profession.

This Court previously found that a policy requiring inmates to prepay for medical services when a serious medical need exists fails to meet constitutional scrutiny and violates the Eighth Amendment of the U.S. Constitution. (Doc. 100). This Court concluded that "while an inmate can be held ultimately responsible for the cost of medical care, it is the jail's constitutional obligation to see that an inmate's serious medical need receives necessary medical attention." *Id.* Here, while ultimate financial responsibility for medical care costs is placed on the inmate, nothing in Greene County's written policy requires the inmate to make prepayment for treatment of a serious medical need. The policy on its face does not contain a constitutional violation. Therefore, the Court looks to whether Plaintiffs have shown Defendants have an unwritten practice, policy, or custom that violates Plaintiff's constitutional rights with regard to the medical treatment of serious medical needs.

Defendants argue that Plaintiffs have failed to state a § 1983 claim for medical mistreatment because they cannot establish a deliberate indifference to objectively serious medical needs. Under § 1983 a deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104–05, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976). Plaintiffs' § 1983 claims for this indifference may arise from a prison doctor's response to the prisoner's needs or from a prison guard's intentional denial or delay in allowing access to medical care, or intentional

16

interference with the treatment prescribed. *Id.* "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* at 106.

In order to analyze whether Defendants were deliberately indifferent to Plaintiffs' serious medical needs the Court must look at both an objective and a subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (internal citation omitted). Plaintiffs must demonstrate: (1) that he suffered objectively serious medical needs, and (2) that Defendants actually knew of but deliberately disregarded those needs. *Id.* As this Court has already held, Plaintiffs must establish that their medical needs are serious. However, "the failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Id.* "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Id.* "Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation." *Id.*

Defendants can be "found free from liability if they responded reasonably to a risk, even if the harm ultimately was not averted." *Id.* at 1240. If the medical records indicate that treatment was provided and physician affidavits indicate that the care provided was adequate, Plaintiff cannot create a question of fact by merely stating that he did not feel he received adequate treatment. *Id.*

When an "inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, 'the objective seriousness of the deprivation should also be measured by

reference to the effect of delay in treatment.'" *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005)(citations omitted). An "inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *Id.* As to any sophisticated medical condition, "failure to produce expert testimony to prove that a lack of proper medical treatment" caused an inmate's injury is "fatal to [his] deliberate indifference claim as a matter of law." *Alberson v. Norris*, 458 F.3d 762, 766 (8th Cir. 2006). If an inmate fails to provide evidence to support his claim alleging damage from delay in care his claim must fail. *Id.* Further, if an inmate has evidence of "his diagnosis and treatment, but he offer[s] no evidence establishing that any delay in treatment had a detrimental effect, the inmate fail[s] to raise a genuine issue of fact on an essential element of his claim." *Jackson v. Riebold*, 815 F.3d 1114, 1120 (8th Cir. 2016) (citations omitted).

Under the subjective standard, an official is deliberately indifferent if he or she knows of and disregards an excessive risk to an inmate's health or safety, is aware that the inference could be drawn that a substantial risk of serious harm exists, and also draws that inference. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The Supreme Court has likened deliberate indifference to a criminal recklessness standard. *Id.* at 839. Finally, deliberate indifference is greater than gross negligence and requires more than mere disagreement regarding medical treatment. *Pietrafeso v. Lawrence County, S.D.*, 452 F.3d 978, 983 (8th Cir. 2006).

The Court looks to each individual Plaintiff's claim under the § 1983 precedent.

**Hancock**

The Court previously held Hancock had a serious medical need with regard to his hernia. The record reflects that a physician opined that Hancock required surgery to repair the hernia falling under the definition of "a serious medical need" as "one that has been diagnosed by a

18

physician as requiring treatment."  However, the Court did not previously find sufficient evidence regarding Hancock's back pain, or arthritis, to constitute a serious medical need.  The Court finds now, based on the additional evidence submitted through summary judgment, Hancock has not provided any basis for a serious medical need that arises from his alleged back pain or arthritis. Hancock's alleged complaints regarding back pain do not constitute a serious medical need under § 1983.[10]

Next, the Court looks to whether there is evidence of an inference of deliberate indifference to Hancock's constitutional rights.  Evidence of possible negligence is insufficient to create an inference of deliberate indifference.  *Dulany v. Carnahan*, 132 F.3d at 1240.  "Grossly incompetent or inadequate care can constitute deliberate indifference in violation of the Eighth Amendment where the treatment is so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care."  *Id.* at 1240-1241.

The Court finds the facts in this case are similar to *Dulany v. Carnahan*.  *Id.*  In *Dulaney*, the Eighth Circuit affirmed the district court's order stating even though one of the plaintiffs alleged that that prison officials failed to follow the recommendations of her outside consultants "a prison doctor remains free to exercise his or her independent professional judgment and an inmate is not entitled to any particular course of treatment" *Id.* at 1240 (citation omitted).  Further, the Eighth Circuit found that the plaintiff failed to demonstrate harm from any delay in treatment even if the plaintiff had a serious medical need.  *Id.*  The Eighth Circuit stated that the medical records indicated that prison physicians actively attended to the inmate's needs and provided

---

[10] Even if the Court were to find Hancock's back pain rose to the level of a serious medical need, for the reasons set forth herein his claim would still fail to establish a § 1983 claim of deliberate indifference.

diagnostic procedures in attempts to determine the cause of her pain and there was no evidence to indicate that the prison medical officials did not respond reasonably to her medical needs. *Id.*

Here, there is no evidence that the care provided to Hancock was grossly inadequate or resulted in any serious harm to Plaintiff. Plaintiff has failed to provide evidence from which a trier of fact could draw an inference that his medical treatment was grossly inappropriate or evidenced intentional maltreatment. Hancock was seen on numerous occasions by medical providers both at Greene County and outside the jail within the Mercy health system. He was not required to provide prepayment for that care. While Hancock was referred for elective hernia repair surgery while incarcerated at Greene County, there is no evidence that the surgery needed to be performed within a certain time frame or that Defendants' decisions regarding the surgery amounted to inadequate care or grossly incompetent care. Hancock was informed that if his conditions worsened, or if the hernia became strangulated, that he seek immediate care. However, there is no evidence any of these events occurred during his detention at Greene County. The Court notes that if Hancock's conditions had worsened to a point where the doctors deemed the hernia repair to be an immediate need then the refusal of such immediate treatment based on a requirement for prepayment could form the basis of a constitutional violation. Here, however, while Hancock was a certainly a candidate for elective hernia repair surgery, there was no specific timeframe during which the surgery needed to occur and Defendants' failure to schedule the surgery during the time he was incarcerated at Greene County does not amount to evidence of an indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

While this Court finds that Hancock had a serious medical need with regard to his hernia, the evidence does not support that the treatment he received was inadequate. Here, Dr. Wilkins remained free to exercise his independent medical judgment that the hernia repair surgery did not

20

need to be immediately scheduled. That judgment was consistent with the advice of Dr. Luehr, the outside surgeon. While Hancock was a candidate for the elective repair, there is no evidence of medical malpractice, let alone indifference, and it appears Defendants responded reasonably to the risk by monitoring his hernia for changes. Here, the medical records indicate that Hancock was regularly provided medical treatment.

This finding is further supported by Defendants' retained expert's opinion stating that elective surgery can be offered but at no point did either Dr. Luehr or Dr. Johnson indicate that the surgery had to be done to avoid medical complications or symptoms. Further, Dr. Luehr released Hancock back to Greene County stating that Hancock could be scheduled for "elective repair." While Hancock was a candidate for hernia repair, and ultimately received the surgery, Hancock simply cannot establish that any Defendant impermissibly denied or delayed necessary medical care due to prepayment issues. In addition, the evidence supports that Plaintiff did not suffer any health consequence as a result of Defendants' actions or the alleged delay in the elective hernia repair.

There is no evidence that Defendants knew of and disregarded an excessive risk to Hancock's health or safety, were aware that such an inference could be drawn, that a substantial risk of serious harm existed, and also drew that inference. See *Farmer v. Brennan,* 51 U.S. 825, 837 (1994). Here, Hancock has provided no medical evidence or expert opinion that a delay in his hernia repair created any excessive risk or harm and certainly has no evidence amounting to a criminal recklessness standard. *Id.* at 839. Dr. Wilkins frequently examined and monitored Hancock and found no evidence of interference with daily activities or acute distress. Hancock admits that he made only intermittent subjective complaints to Defendants when he came in for multiple visits during which he was seen for unrelated issues and did not report hernia pain. At

21

the time of his incarceration, Hancock's objective manifestations were taken, such as vital signs, heart rate, range of motion, and all medical examinations indicated Hancock was not in significant pain or distress. Dr. Wilkins was "free to exercise his independent medical judgment" in determining whether the hernia surgery needed to be immediately scheduled. Hancock has failed to provide any evidence that the alleged delay in treatment caused him injury or any medical reasons the hernia repair needed to be performed earlier than it was.

Finally, Hancock has submitted a supplemental memorandum in support of his opposition to summary judgment based on medical records obtained from the June 2020 surgery. (See Docs 293 and 296). Defendants have filed oppositions to Hancock's supplemental brief and records arguing the records are untimely, were not authorized to be filed as a "sur-response," were filed without any authority under the federal or local rules of civil procedure, and that Hancock did not seek, or obtain, leave to file any such additional evidence and arguments. While this Court agrees that Hancock's supplemental filings are not properly before the Court, even if they were, a review of the supplemental information taken in a light most favorable to Hancock does not alter this Court's rulings. At most, the supplemental filings and medical records establish that it was well over a year after Hancock had been transferred out of Greene County before his symptoms worsened. The medical records submitted well after the conclusion of summary judgment briefing reflect that in June 2020 (Hancock left Greene County in March 2019) he was seen for "pain started *several weeks ago* with diarrhea, nausea, and vomiting. The symptoms initially improved, but then returned much more severe 2 days go. He has been vomiting constantly in the last 2 days with sharp stabbing severe abdominal pain …. *The bulge started as a small lump* over a year ago, but *has increased in size significantly in the last few months*…." (*emphasis added*). The late submission of these medical records do not provide support that Hancock required surgery while

in custody at Greene County. During Hancock's incarceration at Greene County none of these symptoms existed.

Here, while the Court has found that Hancock had a serious medical need with regard to his hernia, he cannot establish that Defendants were deliberately indifferent to this serious medical need in order to prevail on a claim under § 1983.

**Blade**

After a review of the record before the Court, the Court finds Blade has failed to demonstrate he has a serious medical need with regard to his complaints regarding his eye. Blade's vision, at his last appointment, had either improved or remained the same. However, regardless of whether his eye complaints rise to the level of a serious medical need, Blade's claim would fail nonetheless as he cannot show a deliberate indifference to his medical needs.

Blade was seen multiple times by the medical staff at Greene County and was also sent to Optiland to be examined by an outside provider. There is no evidence that Blade required a consultation with an ophthalmologist, however, he was referred to one only if he continued to see flashes of light. Dr. White testified he fully expected Blade's complaints to resolve on their own. Defendants' retained experts also reviewed the medical records and concurred that there was nothing to indicate Blade required a consult with an ophthalmologist. Blade argues he should have been sent to a specialist for another opinion. However, Blade fails to demonstrate the need for any treatment and cannot establish he suffered any actual injury as a result of the failure of Defendants to send him to a specialist. See e.g., *Laughlin v. Schriro,* 430 F.3d 927 (8th Cir. 2005). Further, Blade has failed to provide any expert opinion that supports his argument that he received inadequate care, was denied a required treatment, or was injured by Defendants' actions.

There is simply no evidence to dispute that the care provided to Blade by Defendants met the standard of care. Here, Defendants acted reasonably in providing care to Blade, including multiple examinations while at Greene County and a referral to Optiland for examination. Blade has not provided any evidence that an alleged delay in treatment caused him harm or injury. Here, there is no evidence Dr. Wilkins, or any Defendants, had actual knowledge of a risk of harm and failed to act. See *Bryan v. Endell*, 141 F.3d 1290 (8th Cir. 1998).

The Optiland physician stated that Blade could be seen by an ophthalmologist if he continued to see floaters, but he did not recommend any immediate consultation or treatment. When Blade complained of seeing floaters he was given a referral to an ophthalmologist by Dr. Wilkins. However, Blade never saw the ophthalmologist. The record contains a factual dispute regarding whether Blade had access to the $250 required prepayment for the appointment - either in his commissary account or from family/friends.

Regardless of the dispute over whether Blade had the funds to pay for the appointment, the issue before the Court is whether Defendants' failure to send Blade to an ophthalmologist constitutes a § 1983 violation. First, there is no evidence to support that Blade's complaints of seeing floaters constituted a serious medical need. Further, even if it does constitute a serious medical need, there is no evidence Defendants failed to provide treatment or that he required different treatment that rises to the level of deliberate indifference. Here, the record establishes that Blade was seen on numerous occasions, was referred to Optiland, and that his vision had improved after he left Greene County and was evaluated at the Missouri Department of Corrections. For the reasons set forth herein and discussed throughout, Blade has also failed to establish a § 1983 violation.

**Porter**

After a review of the record before the Court, the Court finds Porter has failed to establish a violation of his rights under § 1983 based on his allegations related to the medical treatment he received related to the cyst on the roof of his mouth.   Even if Porter's cyst rises to the level of a serious medical need, Porter has failed to establish a constitutional violation based on the treatment he received while at Greene County.

During his incarceration Porter was seen multiple times by Dr. Wilkins and ACH medical staff.   Porter was also seen by outside medical providers at Cox North, Dr. Fenwick, and Dr. Gibson.[11]   Dr. Fenwick, ENT, performed in-office procedures including fiberoptic laryngoscopy, which entailed the use of anesthesia and recommended an esophogram, also called a barium swallow, that was done at the Martin Center by Dr. McCann.   Porter was not required to prepay for any of these medical examinations or procedures.

Porter was also seen by oral surgeon Dr. Gipson who recommended removal of the cyst, but similar to Hancock's evaluation, Dr. Gibson did not provide a specific timeframe for the removal of the cyst.   Further, Porter did not request to be seen by any ACH medical staff regarding the cyst at numerous times during his incarceration and refused to see the dentist when scheduled to do so.

Here, despite the fact Defendants did not schedule Porter to have the cyst removed with Dr. Gibson, he was seen multiple times by ACH medical staff, and referred to a dentist, ENT and oral surgeon.   Porter was provided with medical care and treatment and cannot establish deliberate indifference based on the standard set forth herein.[12]   Porter was provided antibiotics which appear

---

[11] Porter was also seen by Dr. Greer at Ferrell Duncan regarding unrelated complaints.
[12] Dr. Wilkins referred Porter to a dentist and an ENT on several occasions, prescribed the medications recommended by the ENT and oral surgeon, ordered a CT scan per the

to have reduced the swelling, along with oral hygiene. Further, there is no evidence that the removal needed to be performed within a certain time frame, and to date, despite being released from incarceration, Porter has not sought to have the oral surgery.

The medical opinions set forth in the record state that Defendants met the standard of care, and Porter has provided no evidence to dispute the opinions provided. Dr. Sclaroff, an oral surgery expert, opined that Porter did not have a serious medical need for oral surgery and that the care he received was not deliberately indifferent. Porter has provided no medical opinions to the contrary and he has provided no opinion, other than his own, that the cyst was deteriorative. Finally, Porter has failed to produce evidence to show any detrimental effect of a delay in the removal of the cyst, let alone expert opinion that he has suffered harm by not having the cyst removed. Plaintiff testified in his deposition that he had not obtained any further treatment for the cyst either while incarcerated at Cook County jail, Iroquois County jail, or in Cape Girardeau, or since his release from custody in August or September 2019.

Here, even if the removal of the cyst constituted a serious medical need, Porter has failed to show deliberate indifference in the medical care provided by the Defendants to establish a § 1983 claim. Porter simply cannot establish that the Defendants' conduct rose to the level of deliberate indifference.

---

recommendation of the ENT, ordered a referral for a barium swallow, ordered referral to a dentist, ordered a referral to the oral surgeon, and ordered the nursing personnel to schedule Plaintiff's oral surgery. Plaintiff did not prepay for the numerous hospital visits, doctor's visits, x-rays, or treatments he received while incarcerated at Greene County.

**CONCLUSION**

After a review of the record before the Court, and after considering the facts in a light most favorable to the Plaintiffs, the Court hereby **GRANTS** Defendants' motions for summary judgment for the reasons set forth herein.  (Docs. 236; 239; 242; 245; 274 and 278).

**IT IS SO ORDERED.**

Date:   March 30, 2021                                    _/s/ Douglas Harpool_____
                                                                          Douglas Harpool
                                                                          United States District Judge